**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul E. REIMANN, and Maybeth Farr
Reimann, his wife, Defendants-
Appellants.**

**No. 73–1905.**

United States Court of Appeals,
Tenth Circuit.

Argued July 10, 1974.

Decided Sept. 9, 1974.

As Amended on Denial of Rehearing
Oct. 9, 1974.

George R. Hyde, Dept. of Justice, Washington, D. C. (C. Nelson Day, U. S. Atty., Salt Lake City, Utah, and Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Paul E. Reimann, Salt Lake City, Utah (Reed H. Richards, Salt Lake City, Utah, on the brief), for appellants.

Before BREITENSTEIN, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Paul E. Reimann, defendant below, appeals from a declaratory judgment rendered pursuant to 28 U.S.C.A. § 2201 in favor of the United States establishing boundaries between his property and that of surrounding national forest lands.

Reimann is the successor in title to three tracts of land originally patented in 1907 and 1908 pursuant to homestead entries by Parker B. Pratt, Alvaro A. Pratt and Olive A. Pratt. The description of the lands patented to Parker B. Pratt is as follows:

Northeast quarter of the Southeast quarter, the South half of the Northeast quarter, and Lot One, of Section twenty-two, Township one South of Range two East of the Salt Lake Meridian, Utah, containing one hundred seventy-three and ninety-three hundredths acres.

The description of the lands patented to Alvaro R. Pratt is as follows:

Lots Two, Three, and Four of Section twenty-two in Township One South of Range two East of the Salt Lake Meridian, Utah, containing one hundred sixty-three and five-hundredths acres.

The description of the lands patented to Olive A. Pratt is as follows:

Southwest quarter of the Northwest quarter of section twenty-two and the Southeast quarter of the Northeast quarter and the East half of the Southeast quarter of section twenty-one, in Township One South of Range two East of the Salt Lake Meridian, Utah, containing one hundred sixty acres.

Each of these descriptions is followed in the patents by the phrase "according to the Official Plat of the Survey of the said Land, returned to the General Land Office by the surveyor general . . . ."

The above properties are referred to in the record below as tracts 37, 38 and 42, located within sections 21 and 22 of Township One South, Range two East, Salt Lake Base and Meridian, Utah. Reimann acquired his interest in these tracts in 1948. The Government holds nearly all the land surrounding these tracts as part of a national forest established in 1904.

The present controversy concerns the proper location of the northern boundary line of these tracts, separating them from the national forest lands. The amount of land in dispute here involves some 56 acres.

Three official United States Government surveys form the basis of the present dispute. In 1891, A. D. Ferron contracted to survey the arable portions

of this township. This resulted in a survey of most of the northern three "tiers" of sections in the Township and included a survey of the southern boundaries of sections 13 through 18 (accomplished via "offset lines"), i. e., Ferron surveyed the "top half" of the township including the "centerline" of the township. This survey was accepted as an official survey in March, 1894.

In 1902, A. P. Hanson was directed to complete the survey of the township, coordinating it with the earlier Ferron survey. Hanson, claiming he was unable to locate Ferron's corner for sections 15, 16, 21 and 22, stated in his survey notes that he set a *new corner* for these sections. This new boundary between the sections in the northern and southern "halves" of the township was purportedly located some distance north of the line set by Ferron in 1891. Hanson's survey was accepted by the General Land Office in June, 1903.

Hanson's survey was "investigated" in 1924 by H. W. Miller and was determined by Miller and Land Office officials to be "fatally defective" due to the fact that Miller had found only a few of Hanson's monuments, and also because Miller considered it infeasible for Hanson to have surveyed the area he claimed to have surveyed within the time frame available to him. In 1926 Miller was instructed to "re-establish" the southern boundaries of sections 13 to 18 as surveyed by Ferron in 1891 and to accomplish an "independent resurvey" of those areas surveyed by Hanson "with the usual tract segregations for valid or patented entries in this area, which cannot be conformed to the lines of resurvey." Miller thereupon reestablished the southern boundaries of sections 13 to 18 on the line of the 1891 Ferron survey, thereby moving the northern boundary of Hanson's survey of Section 22 to a position some distance south of where this line had been placed by Hanson. Miller made no attempt to make "the usual tract segregations" for any patented land which, under the Hanson survey, would have been partially located north of the Ferron "centerline", rather he "terminated" the northern boundaries of such tracts on the 1891 Ferron "centerline."[1]

According to appellant Reimann the end result of this "re-establishment" of the Ferron "centerline" of the township was an unlawful condensing of the tracts patented to his predecessors since their lands, as originally patented, were bounded on the north *with reference to the Hanson survey* of the centerline, such survey being the only official survey of Sections 21 and 22 in effect at the time of patent. It is contended by Reimann that Miller in his resurvey was under a duty to "follow the footsteps" of the Hanson survey in determining the correct boundaries of the tracts here in question (i. e., to accomplish the "tract segregations" as ordered in his resurvey instructions), in order to protect the vested rights of the patentees. Instead, Miller refused to follow Hanson's "footsteps" north of the 1891 Ferron "centerline" resulting in an illegal infringement of the vested rights of the patentees.

The Government contends, however, that the Ferron survey of the "centerline" of this township, being senior in time, has always stood as the correct northern boundary of the lands patented in sections 21 and 22 overriding, in effect, the mistaken junior line established by Hanson. Under this theory, the Miller resurvey resulted in no interference with vested rights of patentees since the descriptions in their patents were controlled by the official survey in effect at that time, which, due to its priority in time, was the Ferron survey (at least as to the northern boundaries of these tracts) and the Miller resurvey merely re-established these boundaries.

The primary issue on this appeal centers upon which of these two surveys, the 1891 Ferron or the 1902 Hanson,

1. See the attached explanatory diagram showing the approximate location of these surveys.

controls as to the description of the boundaries in the patents to these tracts.

At the outset, we note that counsel have cited but one case directly in point with the problem we are faced with here, nor have we uncovered other controlling authority through our own research.

We are faced preliminarily with two seemingly inconsistent general rules: (1) "where the lines of senior and junior surveys conflict the lines of the senior survey control . . . ." 11 C.J.S. Boundaries § 61, p. 633; (2) "the survey last accepted by the government before parting with title is the controlling survey." 73 C.J.S. Public Lands § 35, p. 684.

The Government, relying upon the first rule quoted above, contends that the first survey of the common boundary between sections 13 to 18 and 19 to 24—including the corner point where sections 15, 16, 21 and 22 meet—was the Ferron survey, and under this rule the Ferron survey controls the location of this boundary notwithstanding the conflicting (junior) Hanson survey. In support of this contention the Government cites to Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566 (1888); United States v. Weyerhaeuser Company, 392 F.2d 448 (9th Cir. 1967), cert. denied 393 U.S. 836, 89 S.Ct. 112, 21 L. Ed.2d 107 (1968); Van Amburgh v. Randall, 115 Mo. 607, 22 S.W. 636 (1893); and United States v. Macmillan, 331 F.Supp. 435 (D.C.Nev.1971).

Cragin v. Powell, *supra,* is not supportive of the rule as interpreted by the Government since there the Court merely invalidated a conflicting junior survey which was conducted *after a patent based upon the original survey had been issued.* In the present case both conflicting surveys were conducted *prior to* the issuance of any patent and at a time when all the land was still in the Government's hands. United States v. Weyerhaeuser, *supra,* did not involve conflicting *overlapping* survey lines and is

not applicable. Van Amburgh v. Randall, *supra,* is likewise distinguishable on its facts from the present case.

United States v. Macmillan, *supra,* is the strongest case in support of the Government's contention that where two officially accepted surveys conflict and result in an overlap, the survey which is senior in time controls. However, as authority for that rule the opinion cites four cases [Commissioner of Highways v. Beebe, 61 Mich. 1, 27 N.W. 713 (1886); Snodgrass v. Snodgrass, 212 Ala. 74, 101 So. 837 (1924); State v. Talkington, 274 S.W. 314 (Tex.Civ.App. 1925); and Houston Oil Co. v. Brown, 202 S.W. 102 (Tex.Civ.App.1917)], none of which involved a conflict between two officially approved government surveys, both of which were conducted *prior to* title passing from the government. We have found no other authority supportive of the rule as interpreted by the Government applicable to a factual situation such as the one in the case at bar.

■■ Prior to title passing from the United States, it is undisputed that the Government has the power to survey and resurvey, establish and re-establish boundaries on its own lands. Lane v. Darlington, 249 U.S. 331, 39 S.Ct. 299, 63 L.Ed. 629 (1919); 43 U.S.C.A. § 772. But once patent has issued, the rights of patentees are fixed and the government has no power to interfere with these rights, as by a corrective resurvey. Cragin v. Powell, *supra;* United States v. State Investment Company et al., 264 U.S. 206, 44 S.Ct. 289, 68 L.Ed. 639 (1924); Ashley v. Hill, 150 Colo. 563, 375 P.2d 337 (1962); 43 U.S.C.A. § 772. The government has no power to control "previously disposed of lands." Moore v. Robbins, 96 U.S. 530, 24 L.Ed. 848 (1877); Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891); Marr v. Shrader, 142 Colo. 106, 349 P.2d 706 (1960). These authorities support the rule that the government is bound by the last official survey accepted prior to its divestment of title. Since no pat-

ents had been issued between the time of the Ferron and Hanson surveys, the government was empowered in 1902 to re-establish the boundaries on its own land, including the "centerline" of this township which is the boundary of the tracts in question. It exercised this power when it *accepted the Hanson survey* with its new location of the corner monument for sections 15, 16, 21 and 22. Since the government possessed this power to change its boundaries, it cannot now be heard to complain that the Hanson survey was void on the ground that it "overlapped" and, in fact, caused a change in these boundaries.

■ The Trial Court mistakenly relied upon the declaration by Miller and the Land Office officials to the effect that the Hanson survey was "fatally defective." This determination by the Land Office was immaterial. The government retains no power to nullify a patent, nor the survey upon which it is based, once patent has issued. As stated in Moore v. Robbins, *supra:*

. . . in all this there is no place for the further control of the Executive Department over the title. The functions of that department necessarily cease when the title has passed from the government. And the title does so pass in every instance where, under the decisions of the officers having authority in the matter, a conveyance, generally called a patent, has been signed by the President, and sealed, and delivered to and accepted by the grantee. It is a matter of course that, after this is done, neither the secretary nor any other executive officer can entertain an appeal. He is absolutely without authority. If this were not so, the titles derived from the United States, instead of being the safe and assured evidence of ownership which they are generally supposed to be, would be always subject to the fluctuating, and in many cases unreliable, action of the land-office. No man could buy of the grantee with

safety, because he could only convey subject to the right of the officers of the government to annul his title.

If such a power exists, when does it cease? There is no statute of limitations against the government; and if this right to reconsider and annul a patent after it has once become perfect exists in the Executive Department, it can be exercised at any time, however remote. It is needless to pursue the subject further. The existence of any such power in the Land Department is utterly inconsistent with the universal principle on which the right of private property is founded.

96 U.S. 530 at 533–534.

While the finding that the Hanson survey was "fatally defective" provided sufficient grounds for the government to order a resurvey for its "own information", it did not empower the government or its agent Miller with the authority to disregard or "nullify"—to the detriment of intervening patentees—that portion of the Hanson survey which conflicted with the Ferron survey.

■ The fact that Hanson was mistaken in his location of the boundary here in dispute is likewise immaterial in relation to the instant controversy. Being the controlling survey, its location of the boundary between the northern and southern "halves" of the Township takes precedence, even if erroneous (or *"largely fictitious" and "fatally defective"* as found by the Trial Court), insofar as the rights of patentee whose patent was issued thereunder are concerned. United States v. State Investment Company, *supra;* United States v. Doyle, 468 F.2d 633 (10th Cir. 1972); See Ben Realty Co. v. Gothberg, 56 Wyo. 294, 109 P.2d 455 (1941). Furthermore, as concerns the Trial Court's acceptance of the Miller resurvey, it would be inequitable to permit the government to direct the taking of, and to accept a survey (i. e., the Hanson survey), recording it with

knowledge that it would be relied upon by patentees, and then grant the government the right to later correct its error, ex parte, to the detriment of those who did in fact, and in good faith, rely upon it.

It is noteworthy, in an equitable sense, that where the second survey has deviated from a line established by the first survey so as to create a "hiatus" of land between the common lines of the two surveys and where the patentee's lands border on the line created by the second survey and would be enlarged if he were bound by the description in the first survey, that in such cases the government contends that the patentee is bound by the later survey under which his patent was issued, i. e., the same survey which the government here contends is "junior" and not controlling where the surveys *overlap* and reliance upon the second survey would work to the benefit of the patentee. United States v. Macmillan, *supra;* United States v. Weyerhaeuser Company, *supra.*

We hold that the Hanson survey, being the last accepted survey prior to the issuance of these patents in 1907 and 1908, is the controlling survey as to the location of the northern boundaries of these tracts. *See* Churchill Co. v. Beal, 99 Cal.App. 482, 278 P. 894 (1929); Phelps v. Pacific Gas & Electric Co., 84 Cal.App.2d 243, 190 P.2d 209 (1948); Larson v. Larson, 89 Cal.App.2d 846, 202 P.2d 121 (1949).

■ The Trial Court relied upon the fact that the descriptions in these patents were by "aliquot parts", i. e., by fractional parts of the rectangular survey system, and that appellant Reimann could not rely upon the acreage described in the patents. We do not dispute this finding. Rather, we hold that these "aliquot parts" must be determined in accordance with the Hanson survey and not the Ferron survey.[2]

■ Having determined the Hanson survey to be controlling, and that in making "tract segregations" to preserve prior patented land Miller should have retraced the Hanson lines even north of the Ferron "centerline", we are next faced with the difficult problem that the Hanson monuments along the northern boundary of these tracts were not located by Miller in 1924 nor by Reimann's own surveyor. It is well settled that the notes, lines and descriptions in an accepted survey are considered a part of the Patent. Cragin v. Powell, *supra;* Walton v. United States, 415 F.2d 121 (10th Cir. 1969). Further, it would appear to be the rule that where monuments cannot be located they may be re-established from the survey field notes, and if they can be so re-established they will not be considered "lost" monuments. United States v. Doyle, *supra;* 6 Thompson on Real Property, §§ 3044, 3045 (1962); 43 U.S.C.A. § 752; Cornia v. Putnam, 26 Utah 2d 354, 489 P.2d 1001 (1971); Vaught v. McClymond, 116 Mont. 542, 155 P.2d 612 (1945); Henrie v. Hyer, 92 Utah 530, 70 P.2d 154 (1937).

Appellant Reimann contends that by using the few monuments from Hanson's survey that were found, and applying the descriptions of course and distances in Hanson's field notes, the northern boundary of these tracts established by Hanson can be definitely ascertained. We are unable to make that determination based upon this record.

Finally, the following undisputed facts are noted from the pretrial order: (1)

---

2. That the trial court did not appreciate this distinction is evident from the following passage in the record:

   *The Court:* I don't think it makes any difference what plat the patent is based upon. The patent is a conveyance, and it has a description in it, and that description is the description of the only land you have a patent to.

   *Mr. Richard:* But it is based on this [the Hanson plat] your Honor.

   *The Court:* I don't care what it is based on. I don't think in this lawsuit it makes a whit of difference what it is based on. (Tr., Vol. 1, p. 157).

the southern boundary line of tract 38 of the 1927 tract resurveys was and is the south line of lots 2, 3 and 4 of the 1902 Hanson survey; (2) that the north-south lines of the 1927 tract resurveys were correctly located in their position east-to-west to constitute substantial portions of north-south boundary lines of the patented tracts; and (3) that the dispute between the parties arose as to the proper lengths of those north-south lines, and that defendants claimed that in conducting tract resurveys in 1927 Miller shortened the north-south lines not only on the north but also on the *south,* thereby omitting patented acreage from tracts 37, 38 and 42. Miller was clearly under an obligation to make "tract segregations" for patented lands south of the disputed center line of this township. We hold that the Hanson survey, if it can be established, is also controlling in determining the southern boundaries of tracts 37 and 42.

We reverse the Trial Court's determination that the Miller resurvey controls the northern and southern boundaries of these patented tracts, and remand for a determination of the boundaries of the controlling Hanson survey from the field notes of that survey, and such other evidence requisite to such determination, and for the further determination as to whether the Reimann properties acquired in 1948 and subsequently are within the boundaries of the Hanson survey.

T. 1 S., R. 2 E.*

LEGEND:

X-X-X-X-X     Ferron survey line; re-established by Miller.

- - - - -     Hanson survey line.

o     Purported "new corner" established by Hanson.

\* This Diagram is for illustrative purposes only, and does not purport to be an accurate description of the actual boundaries disputed in this case.